Liquid Chemistries v. Axis-Shield, 2007-13-49 Mr. Walker, when you're ready. Thank you, Robert. Thank you. A little more complicated case than the last one. A little more complicated, Your Honor. This is a patent case. We are appealing the summary judgment of non-infringement. Two separate summary judgment adjudications. I represent Axis-Shield. My name is Timothy Walker. And with me is Paul Nyquist, who is on the brief. I found the briefs in this case really confusing. I hope that the oral argument will be clearer. Well, if the court has a particular point of confusion, I'm happy. I'm here to try to clarify things. I do have a question about column 3 of the specification and this other preferred embodiment at line 48. Yes. And maybe I don't understand this correctly, but the assay is being conducted on adenosine, right? I'm sorry? The assay is being conducted on adenosine in the second preferred embodiment. What is being assessed is adenosine. Yeah. In that embodiment as it's described in your culture. The adenosine there, is that a co-substrate? It is identified at the top and in that column as the homocysteine co-substrate of the reaction. But is it in the reverse reaction, is it a co-substrate? It is still within the meaning of the patent, a homocysteine co-substrate of the, and maybe I'm not understanding the court's question here, but within the meaning of the patent. Under the district, not under your interpretation of the claims, but under the district court's interpretation of the claims, is it a co-substrate? In the reverse reaction, it is not. Yeah. And it's also not a conversion product, right? That's correct also. So I would have thought that you would rely heavily on this part of the specification to argue that the district court's claim construction is incorrect because this preferred embodiment is contemplating an assay which isn't directed either under the district court's construction to a co-substrate or a conversion product. Am I misunderstanding something? Well, I think we did rely heavily on the embodiment disclosing… Yeah, but I didn't see you making quite this point. Maybe I'm not understanding the court's point. Well, the point is that under the district court's construction of this patent, that this preferred embodiment does not come under that construction because the adenosine is neither a co-substrate or a conversion product. So that would suggest to me, perhaps, that the district court's construction is incorrect. I agree with that. I do agree with that, and I think we tried to approach that and articulate the argument in a little different way because what the district court did, and I think what General Atomics tries to argue, is to say, well, even though all the adenosine molecules are identical, some adenosine molecules count as homocysteine co-substrate and some do not. And our arguments were really intended to explain why that dichotomy is incorrect and unsupported by the patent. And the point that you're making is absolutely right. We agree with that, that a basic problem with the claim constructions is that it is inconsistent with the embodiment described in Column 3. Okay. I'm not quite sure that your brief states that very clearly, that the claim construction of the district court as made would essentially read out your preferred embodiment. I don't think you'd come straight out and say that in your brief. Well, I think we . . . I had the same problems that Judge Dyke did when we were trying to understand the blue brief itself. It was very difficult to follow. I apologize for that. I'm not an expert in the area, but at least we try to understand what we're doing. I apologize for that. To the extent it wasn't clear, I think we were trying to make the point that the court . . . or encompasses using the homocysteine conversion reaction where it's reversible in both directions. And we explained that it's in both directions, and we explained that the district court's claim construction seemed not to capture that concept adequately, and for that reason did not . . . homocysteine converting enzyme, for example, where the court required that the enzyme act on sample homocysteine. We pointed out in the blue brief that that implies a reaction in a certain direction, in the forward direction, and not in the opposite direction, and that this embodiment in Column 3 includes the opposite direction. Mr. Walker, let me make it unanimous. I found the blue brief confusing as well, and I want to know . . . It seems to me this whole question of reversibility is confusing, and it seems to me to be irrelevant. The question is whether what General Atomics is doing is within the properly construed claim of . . . You've got two claims. Would you point out to me where the General Atomics process meets all the limitations of Claim 1 of the 127 patents? Because it seems doubtful to me. With respect to the . . . You've got a homocysteine converting enzyme. Yes, Your Honor, and that can be . . . Which is HMTase, right? Well, there are two enzymes being used by the accused assay. Let's take one at a time. Okay. And at least one substrate for an enzyme other than homocysteine. That's SAM, right? Yes, Your Honor. And you're assessing an analyte, which is a substrate for said enzyme, and that analyte is SAH. Yes. Wherein the improvement is, let's look at number two, assessing a non-labeled analyte selected from a group consisting of a homocysteine co-substrate, which is SAM. Yes. And they are not doing that. They assess SAH, right? Correct, which . . . And they're selecting the group consisting of. This is a Markowitz group. In other words, one or the other. And the homocysteine conversion products of the enzyme at conversion of is methionine because it transfers, the SAM transfers a methyl group from homocysteine to methionine. And they don't do that. Well, we differ with the district court's construction of homocysteine conversion products on that point. We contend that it was an error for the district court to read it. Are you saying that SAH is also a conversion product? Yes, Your Honor. But the methionine is really a conversion product of the homocysteine. It's simply methylated. But the term homocysteine conversion product. And the analyte is SAH. We think it was error to construe the term homocysteine conversion products that narrowly. We think that the term homocysteine conversion products refers to all the products of that reaction. Including the analyte? Including SAH. Yeah, which is the analyte. Which is the analyte, yes. I think SAH is the conversion product of SAM, which has lost a methyl group. Well, I think it depends on how one wants to read homocysteine conversion product. I think we read homocysteine conversion product as, well, I think first of all we read, we don't think the limitation that the court is relying on and that the district court relied on is taught by the patent. There is no distinction made in the patent between different kinds of products. Yeah, but it's almost plain English or at least chemical English. I'm sorry? It's almost plain chemical English, plain English. The conversion product of homocysteine is the methylated derivative thereof. And the SAH is a conversion product that's demethylated. Well, I'm sorry. I guess our reading of it is that it's, that homocysteine conversion products refers to all the products of homocysteine conversion. And when you convert homocysteine using this particular enzyme and that particular reaction, you get all the products. You can't pick and choose what products you get. You get all the products in a chemical reaction. You get all the products but they're not necessarily all homocysteine conversion products. I don't think there's any teaching in the patent that there is a separate category of products of any kind. There's nothing in the patent that they can point to that teaches that. They have had to import into their brief, they've had to make up a term that they used in their own patent, and they're allowed to do that in their own patent, but they've had to import that into this claim. We've run into you, into your rebuttal time. Why don't you, is there another point or two you want to make? We do have the SAH hydrolase theory, and we do think that they infringe by the use of SAH hydrolase. Well, there isn't it unclear where the homocysteine is coming from? I mean, you've got two possible routes there. Again, we say it doesn't matter. Some of the SAH is the result of something that falls within the claim language and some of it isn't under the district court's claim construction, and the assay doesn't distinguish between the two kinds of SAH. That's the problem, right? Well, the assay doesn't distinguish, but neither does the patent. The patent teaches that, the patent is really, should be read as claiming substances and compounds based on their composition and not on assay reactions. I think that's our, that is the critical disconnect here. And you have to, and it doesn't, so the patent doesn't teach, and again the column three embodiment doesn't distinguish between different kinds of SAH. The embodiment in column three includes adding excess SAH and generating adenosine and generating non-sample homocysteine. And there's nothing in the assessing process that's described in column four of the patent that makes any distinction there between, or somehow sorts that out. It is a rate-based analysis, and the rate has something to do with how much homocysteine you started with. And it's therefore not an assay that is dependent on any chemical reactions of the assay. It's a broader disclosure than that, and the claim should have been read broader than that. Why don't we listen to Mr. Calmer and we'll give you all of your rebuttal time back. Thank you. May it please the court. I'd like to talk first about this inhibition embodiment and whether it is covered by the district court's construction. Yeah, that would be very helpful, because there's a lot to be said for the district court's construction, but I ran into a problem with this embodiment in the specification, because it seemed to me that the adenosine wasn't either a close substrate or a conversion problem. That's correct. The district court looked at it the same way and said, this is not the preferred embodiment, this is the second embodiment. And it's basically the preferred embodiment run in reverse. So the district court said, if you're looking at this running purely in this reverse direction, where you're splitting SAH into homocysteine and adenosine, you don't meet a number of the claim limitations. There's no homocysteine converting enzyme, for example, and there's no conversion of homocysteine. So she wasn't so worried about covering just that direction, but Axis Shield told the district court that this inhibition embodiment runs in both directions at the same time. So the district court said, okay, well, when it's going in the reverse direction then, when it is combining homocysteine with adenosine into SAH, that's essentially the preferred embodiment, and that is covered. Then homocysteine is combining with adenosine as a co-substrate to form a conversion product, SAH. So what you're saying is that this description of this alternative embodiment in the specification runs both ways. Running in one way is not within the claims, but running in the other direction it is. Exactly. And that's based on the representation they gave to the district court as well, that it runs in both directions. That's only the second one, not the first one. Not the first embodiment that's shown in column three. Oh, that's right. You're right. It's the second embodiment. Let me ask you something. With respect to the term homocysteine conversion products, that only appears in the abstract of the patent, right? Correct. What impact would the use of the terms in Claims 3 and 8 have on trying to establish what Claim 1 means? Claim 1 is the narrowest of those. Claim 1 adds more words, more modifiers to the words, conversion products. So it should be read the narrowest of those. Now, as I understand it, the real determination that was made by the court was that the conversion products, the products of the enzyme conversion of homocysteine by the enzyme would cover all of the products rather than just those derived from homocysteine, right? So that's a much broader reading. Well, Craig, she did say that her reading of it does cover every embodiment. It does cover every embodiment in the specification. And the way she reads it is it just tracks exactly what the preferred embodiment is. That's exactly what the preferred embodiment does. It assesses the conversion product that is derived from homocysteine. But that only covers the reversible or both as described in Column 3? In Column 3, so in the preferred embodiment, when it's running in the normal direction, when it's combining the two into SAH, definitely covers that. Then the other embodiment is this inhibition embodiment, which they say runs two directions. The district court said that it is covered by her construction when it's running backwards, but not when it's running just in the hydrolysis direction. Yeah, exactly. And that's where she said it wouldn't be covered for a number of other reasons. It doesn't meet other requirements. I was confused about something you just said. I would have thought in the preferred embodiment that the adenosine is covered because it's a co-substrate. I thought you said it was a conversion product. Did I misunderstand? Oh, maybe. You're right. It is a homocysteine co-substrate in the preferred embodiment. That's right. I must have misspoke. The other thing I wanted to clear up was there was a question about the general atomics assay and whether it assesses an analyte, which is a substrate for said enzyme. And the question is whether SAH is a substrate for HMTAs. It is not. The evidence in the district court was that it is not because HMTAs is not a reversible enzyme. So once it has formed SAH, it can't split the SAH back again. And Axis Shield had— SAM is the co-substrate. SAM is the co-substrate, exactly. So the enzyme is not reversible. We gave evidence of some articles from the 1960s saying it's not a reversible enzyme. And Axis Shield asked improperly, but they asked in their brief for time to do some experiments to try to prove that it's reversible. The district court denied that request to do more experiments, and they did not appeal that issue. So I just wanted to clarify. Then also, on the subject of the SAH hydrolase theory that they have, in their reply brief, they point out— they say that there is a new definition of homocysteine co-substrate that comes from this column three discussion of reversibility. And what they're saying is that— you can tell, by the way, they're using the words that even when something isn't really being used as a co-substrate, it qualifies as one. Well, for one, I'd say that it's hardly clear that that's what they're saying. And what they don't mention is that farther down in the discussion of the inhibition embodiment, they refer to splitting the SAH into homocysteine and adenosine, and they don't call adenosine a co-substrate there. That would have been the place to do it if they were trying to be clear. And also, they told the district court that the definition, the express definition of homocysteine co-substrate comes from back in column two. And we agreed with that, the district court agreed with that, and she gave her construction of homocysteine co-substrate based on column two, where we told her to look. They didn't like the construction, so now they've come in and said, there's a different express construction elsewhere in the patent, and it just can't be right. And the reason that they are pushing for this theory that a substance is a co-substrate, if it could be used as a co-substrate someplace else, even if you're not using it as one in your own assay, it's because of this SAH hydrolase theory. So this is where the district court assumed their facts. She assumed that it was true that when we run our assay, we first do the HMTA's reaction and it creates the SAH. And then we add the second enzyme that splits the SAH into homocysteine and adenosine. They contended, and the district court accepted this, that the reaction also backs up to some degree, and the homocysteine and adenosine combine to form SAH. The district court said, but that still doesn't matter because you can't assess, you can't determine the amount of SAH that's formed when it's going backwards. And the same analysis applies for the co-substrate, because you can't tell how much adenosine combined with homocysteine to form SAH for the same reason. It's in a pool of SAH that was also formed by the HMTA's. So the same analysis applies to the co-substrate. So then they have to make the argument that, well, when you split it again, when the SAH hydrolase acts on SAH again and it splits into homocysteine and adenosine, you do end up measuring that adenosine, which is true. But they say it's still deemed a co-substrate, even though you're not actually using it as a co-substrate. I think that would be a very unfortunate precedent to set, that people skilled in the art would have to look not only how their inventions actually work. What about the idea asserted by your opponent that SAH is a homocysteine conversion product, because it is obtained in the same reaction when you convert homocysteine into methionine, containing a methyl group, and the SAM, which starts with a methyl group, loses it. And so in the same reaction, SAH is produced. So why isn't that a co-substrate of the homocysteine conversion? Well, the SAM is a co-substrate, but we don't measure SAM. It disappears. It's gone. So then we do measure the SAH that results. But it's not a co-substrate. No, but isn't it a conversion product of the homocysteine conversion? It's a conversion product of the overall reaction, but it comes from the co-substrate, not from the homocysteine. And in the one place in the specification where they do mention the conversion of homocysteine, it's in column one, they refer to homocysteine conversion into methionine, even though it has the same methyl donor reaction going on. They don't refer to the results coming from the co-substrate. They don't refer to that as being— And that was the claim court's construction. Excuse me? That was the construction of the district court. Exactly. I want to bring you back again to column three because I'm still bothered by this, okay? And I understand what you say about the second embodiment here, it's being reversible. And that when it runs in the reverse direction, it satisfies the claim limitations as adopted by the district court. But doesn't that lead to the problem that you can't tell whether the adenosine, which is the object of the essay here, comes from the forward reaction or the reverse reaction? It's sort of the same problem that we have with respect to the reverse reaction that you undertake. Do you understand what I'm saying? Yes, exactly. And it's different because axis shield adds a fixed amount of SAH. So then if you measure the SAH, you can tell how much adenosine combined with homocysteine to form SAH. The amount would go up. Or if none of it was acting with homocysteine, there would be a much lower amount of SAH. We don't control the amount of SAH we put in. Our SAH is formed by the reaction with homocysteine in that reaction, that first reaction. So we can't tell, but they have a way they can tell. So they can assess how much adenosine was formed in that back reaction. They also say you could measure just the adenosine that's remaining. So you could do either one. You could measure the remaining adenosine or the remaining SAH. And by that, you would know how much reacted with homocysteine. Does that make sense? I think so. Yeah, thank you. But isn't really the fact that the patentee claimed a very narrow class of conversion products, basically those derived from the homocysteine? Well, yes. I wouldn't say that it's that narrow. It does cover—it's exactly their preferred embodiment, and that's all of their embodiments. They have no teaching of assessing anything other than something that came directly from the homocysteine. So that's a pretty narrow definition of the conversion product. It has to be derived from the homocysteine, isn't it? Yes, it does have to be derived from the homocysteine, exactly. Well, SAH isn't derived from homocysteine. It's simply the result of the demethylation of SAM that occurs in that reaction. Correct. That's why it's not a homocysteine conversion product. That's right. Yes, exactly. And the last point that I wanted to make— So it's not limited to that, then? You're saying it's a broader class than just conversion products derived from homocysteine? No, I'm saying that the claim covers only the conversion products from homocysteine, the things coming from homocysteine. The other question is that we don't do that. We assess something that's different. We co-substrate. And the last point I wanted to make is in response to another argument that was made for the first time in the reply brief. Access Shield offered a new proposed construction of homocysteine conversion products where they put the emphasis on homocysteine conversion as if it were hyphenated. And I guess the first point is this was raised for the very first time in the Gray brief on appeal. It was never raised before as a plausible construction. And Access Shield's contention is that because there's this other possible way to read the claim, the claim is ambiguous. And so the court should look to the specification and give the claim its broadest possible meaning. And they're wrong on all counts. They told the district court the claim language was clear, as did we. The limitation is not ambiguous. But even if it were ambiguous, the result under Halliburton and athletic alternatives is that you would apply the narrower construction, not the broader. We've had a lot of discussion this morning about the meaning of the specification here. Did either side put in an expert testimony interpreting the specification? Yes, there was an expert testimony. Yes. Is that in the joint appendix? There is some in the joint appendix, yes, Your Honor. Okay. How did a Norwegian company get the name Access? Oh, that I don't know. Okay. Thanks very much. All right. Thank you. Mr. Walker has some rebuttal time. Thank you. Thank you. I guess I'd like to emphasize that the accused assay uses the preferred enzyme identified in column three, SAH. It uses exactly the assessing step disclosed in column four, continuing over to column five of the patent. And the district court found that somehow the assessing... Did you say SAH is an enzyme? I'm sorry, SAH hydrolase? Hydrolase. I'm sorry. SAH hydrolase, the preferred enzyme, they use that. They use the same assessing process that's disclosed in the patent in columns four and five and six. And it's particularly scheme two where adenosine deaminase is used to convert adenosine into inosine and ammonia, followed by a color reaction and following the color reaction with a spectrophotometer. That is what they do. They do it with a... What's disclosed in the patent is a rate-based analysis. It's incorrect to say that what's disclosed in the patent uses a fixed amount of SAH and somehow we calculate exactly what the reaction is. We look at how fast the reaction is going, and it's the speed of the reaction that is measured both in the embodiment and in the accused assay. But you don't know how much of the SAH is obtained through the hydrolase reaction and how much through HMTase. In the preferred embodiment, that's correct. We don't know that in the preferred embodiment. It's not known because excess... What's disclosed in the preferred embodiment is that SAH generally in excess, it was on column three, is added. And there's no measurement. Mr. Cohn was just wrong to say that there's some measurement. I think Judge Lurie was asking you about the general atomics method. You can't distinguish, right? That's correct. You can't distinguish it in the accused assay, and you can't distinguish it in the preferred embodiment either. And that's why we think that the... That's why we think it reads on or it's improper to have plain constructions that say that somehow we don't meet the assessing limitation just because we don't make that distinction. It's not taught in the patent. Just one other question. Mr. Kummer answered my questions about the alternative embodiment in column three here. Did he say anything that was inaccurate? Well, he did say that there was a fixed amount of SAH added, and there isn't. It says SAH is added generally in excess when you're running the reaction in the reverse direction. And again, he implies that somehow the assessing process is some counting of the molecules that are being produced, the adenosine molecules being produced. What's being measured is a rate. It's a speed. The speed can be related to initial concentrations of the reactants. If you take the speed at a specific time, you can relate that to what you had as initial reactants. But the whole point is you're assessing an amount, not a rate. You're assessing an amount of an assistator. That's correct, but you assess it by measuring a rate. That is what the patent is talking about when it says that measurements are being taken in a kinetic mode in a number of the examples that's referred to. And in column three, the point is made that you can look at the change in concentration. But that's not what the claims say. Well, the claim just says assessing and assessing. Assessing and analyte. Excuse me? Assessing and analyte. That's correct, but assessing is very broadly defined in the specification. It usually means how much. But it doesn't limit how one determines how much. And how this is being done is by a measurement of rate and then using the rate to turn that into a measurement. But the rate would be dependent on the amount of catalyst which is added to the reaction. That's generally true, yes. But the rate will also depend on how much of the reactant is there. And that's really the basis of the assay and of the analysis. What one does is the accused assay, for example, what's done there is there's a kit. And so there's a measured amount of enzyme used. And then there's an automated spectrophotometer that takes measurements at automated times. And so you know the rate at a particular time. And then you compare the rate of your sample to the rates that were obtained using known calibrators. And then you use the calibrators to draw a chart. And that chart then is used when you get the unknown of your sample. How do you control the rate then, except by adding more or less enzyme? Well, you don't control the rate. You measure the rate. If you want a faster rate, you add more enzyme. If you want a slower rate, you decrease the amount of enzyme. No, your honor, you add exactly the same amount of enzyme. And then you run three samples, typically. You run a sample having a very low amount of homocysteine, or zero. But a known amount. You run another sample that has a known amount, high homocysteine. You see what the rates are for those two knowns. Those two points give you a graph for rate. You can then draw a line. And you measure the sample that you're interested in. And you see where the rate falls on that line. And then you interpolate and determine what the concentration of homocysteine must have been in your sample to get that rate. But your chromograph then would be of the anacin, not of the homocysteine. Is that correct? When you take the chromographic analysis, what do you start with? Well, what you're detecting as far as – I'm not sure I understand the question. But what you're detecting with your analysis is a color that is being generated by something in the solution. And in general, what's generating the color is none of these things. Because you can – what you do is you run through a series of reactions that eventually gives you a colored species that you can easily measure. And in the case of the accused assay and in this preferred embodiment, you take the adenosine. You contact the adenosine with – you have an enzyme in there called adenosine deaminase. That catalyzes a reaction that turns the adenosine into, among other things, ammonia. And then there are a number of ammonia reactions that generate color. And that is what is disclosed in the patent and that is what the accused assay does. And then you measure how fast the color is changing during a specific period of time after you've added the enzyme. Of course, we're interpreting not what's in the patent but what's in the claims. But the claims don't limit how the assessing process is being done. I think we understand your case, Mr. Walker. Thank you. Thank you. Thank you, members of the audience.